**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville (*pro hac vice forthcoming*)
Connor C. Boehme (*pro hac vice forthcoming*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| E.L.F. BEAUTY, INC., TARANG P. AMIN, and MANDY J. FIELDS, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

1.     The Boston Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' (as defined herein) public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding e.l.f. Beauty, Inc. ("ELF" or the "Company"), analysts' reports, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This is a class action brought on behalf of a "Class" of all persons or entities who purchased or otherwise acquired ELF securities between May 25, 2023 and February 6, 2025, inclusive (the "Class Period").  Plaintiff brings this action seeking to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.     Founded in 2004, ELF is an Oakland, California-based multi-brand beauty company that offers low-cost cosmetics and skincare products.  Although ELF began with an initial focus on direct-to-consumer e-commerce, which allowed it to build a strong customer database and social networking site with over two million members, the Company now employs a retail distribution strategy aimed at offering ELF products wherever consumers shop for beauty products.  The Company's retail partners, including Target, Walmart, and Ulta Beauty, accounted for roughly 75 percent of ELF's sales revenue throughout the Class Period.

4.     By mid-2023, ELF began to experience slowing consumer demand trends for its products as its inventory levels jumped in the fiscal quarters that followed.  In order to conceal slowing consumer demand from investors, ELF attributed the rapid increase in the value of its inventory to accounting modifications resulting from changes in shipping logistics, and to planned efforts "to support the strong consumer demand we're seeing."  As the Class Period progressed,

1  Defendants continued to tout ELF's "strong consumer demand," while assuring investors that the
2  Company had "really great visibility to our business."

3       5.      This complaint alleges that, during the Class Period, Defendants misled investors by:
4  (1) failing to disclose that declining consumer demand trends were negatively impacting the
5  Company's business; (2) falsely attributing the increase in ELF's inventory value to accounting
6  adjustments arising from changes in shipping logistics and planned efforts to support "strong
7  consumer demand"; (3) reporting inflated ELF's revenues and profits; (4) providing false assurances
8  about the adequacy of ELF's inventory controls; and (5) as a result of the foregoing, making public
9  statements about the Company's business, operations, and prospects that were materially false and
10 misleading.

11      6.      On August 9, 2024, investors began to learn the truth about the slowing consumer
12 demand for ELF products when the Company released its fiscal Q1 2024[1] results and provided its
13 outlook for fiscal Q2 2024.  Specifically, ELF issued meaningfully weaker-than-anticipated guidance
14 for fiscal Q2 2024 and acknowledged downward pressure on its adjusted EBITDA guidance,
15 approximately $30 million lower than expected by analysts, signaling a sequential slowdown in
16 growth.  On this news, ELF's stock price fell $27.12 per share, or 14.4 percent, to close at $160.83
17 per share on August 9, 2024.

18      7.      Then, on November 20, 2024, Muddy Waters Research published a report accusing
19 ELF of revenue fraud and raising concerns about the Company's inventory management practices
20 (the "Muddy Waters Report").  Specifically, the Muddy Waters Report alleged that ELF overstated
21 its revenue by $135 million to $190 million during the Class Period.  The Muddy Waters Report
22 further accused ELF of concealing declining customer demand from investors by falsely attributing
23 the rising value of its inventory to a supposed change in its practice of taking ownership of inventory
24 upon arrival at distribution centers in the United States instead of in China when the products ship.
25 Following publication of the Muddy Waters Report, ELF's stock price fell $2.71 per share, or 2.2
26 percent, to close at $119.00 per share on November 20, 2024.

27

28 [1] ELF's fiscal year ends on March 31st and its fiscal Q1 2024 ran from April 1, 2023 to June 30, 2023.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

8.      Finally, on February 6, 2025, ELF released its fiscal Q3 2024 results and reduced its financial outlook for the first time since the onset of the COVID-19 pandemic.  Specifically, ELF lowered its revenue and adjusted EBITDA guidance for fiscal 2025.  Management explained that these downward revisions reflected lower demand trends, challenging category conditions, and slower-than-expected new product performance.  On this news, ELF's stock price fell $17.36 per share, or 19.6 percent, to close at $71.13 per share on February 7, 2025.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and Class members have suffered significant losses and damages.

**JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements and the subsequent damages took place in this judicial district and ELF is headquartered in this Judicial District.  The intra-district assignment to the Oakland division of the Court is proper under Local Rule 3-2(d), because a substantial number of the events or omissions giving rise to the claims arose in Alameda County, where Defendants conduct business.

13.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

14.    Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased ELF securities during the Class Period and was damaged as the result of Defendants' wrongdoing alleged in this complaint.

15.    Defendant ELF is a Delaware corporation with principal executive offices located at 570 10th Street, Oakland, California 94607.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "ELF."

16.    Defendant Tarang P. Amin ("Amin") has served as ELF's Chief Executive Officer at all relevant times.

17.    Defendant Mandy J. Fields ("Fields") has served as ELF's Chief Financial Officer at all relevant times.

18.    Defendants Amin and Fields are collectively referred to herein as the "Individual Defendants."

19.    The Individual Defendants possessed the power and authority to control the contents of ELF's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of ELF's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within ELF, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.    The Company and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

21.    ELF, short for EyesLipsFace, was founded in 2004 as a provider of inexpensive, high-quality cosmetics.  ELF has retail presence in 15 countries, with about 80 percent of its revenue

4

generated from sales to U.S. purchasers.  Roughly 80 percent of ELF's products are manufactured in China through a "close collaboration with a network of third-party manufacturers."

22.    ELF brands, including e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People, and Keys Soulcare, are sold online on a direct-to-consumer basis as well as through beauty, mass-market, and specialty retailers.  These retail partners including Target, Walmart, and Ulta Beauty, accounted for roughly 75 percent of ELF's revenue throughout the Class Period.

23.    Effective inventory management controls are crucial for the financial performance of retail companies like ELF.  Because ELF's financial health depends on sufficient levels of product inventory to effectively meet customer demand, ELF's investors rely on the Company's ability to maintain adequate inventory levels without stalling production or sales.  During the Class Period, ELF stated that "we feel quite comfortable with the inventory that we have on hand."  At the same time, the Company assured investors that "We have rigorous inventory control procedures, including regular physical and cycle counts across our global distribution network."

### A.    Materially False and Misleading Statements Issued During the Class Period

24.    The Class Period begins on May 25, 2023, the day after ELF issued a press release announcing its financial results for the fourth quarter and fiscal year ended March 31, 2023 (the "Q4 2023 Press Release").  In the Q4 2023 Press Release, ELF stated that "Net sales increased 78% to $187.4 million, primarily driven by strength across our retailer and e-commerce channels." Defendant Amin was further quoted in the Q4 2023 Press Release as stating: "We grew net sales by 78% in Q4, marking our seventeenth consecutive quarter of net sales growth."

25.    During the corresponding earnings call held that same day, Defendant Fields touted ELF's strong demand trends:

> First and foremost, we plan to continue to invest in our people and infrastructure to fuel our growth. As [Defendant Amin] discussed, this year we plan to invest behind our ERP transition to SAP, working capital to support *the strong demand we continue to see*, and increasing our distribution capacity.

26.    On May 25, 2023, ELF filed a quarterly report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fourth quarter and fiscal year ended March 31,

2023 (the "2023 10-K"). The 2023 10-K made the following statement about the effectiveness of ELF's internal control over financial reporting:

> Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based upon the framework in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, **management concluded that our internal control over financial reporting was effective as of March 31, 2023**.

27.      Appended as an exhibit to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that they had reviewed the Form 10-K, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

28.      On August 1, 2023, ELF issued a press release announcing its financial results for the first quarter of the fiscal year ended June 30, 2023 (the "Q1 2024 Press Release"). In the Q1 2024 Press Release, ELF stated that "Net sales increased 76% to $216.3 million, primarily driven by strength in both our retailer and e-commerce channels." Defendant Amin was further quoted in the Q1 2024 Press Release as stating: "This marks our 18th consecutive quarter of delivering both net sales growth and market share gains."

29.      During the corresponding earnings call held that same day (the "Q1 2024 Call"), Defendant Fields made the following characterization about ELF's inventory levels:

> **Our ending inventory balance was $98 million, in line with our expectations and up from $70 million a year ago**. As a reminder, last quarter we spoke about **plans to build back our inventory levels through fiscal 2024 to support the strong consumer demand we're seeing**.
>
> […]

We expect our cash priorities for the year to remain on investing behind our growth initiatives and supporting strategic extensions. Some of the initiatives we're focused on this year include investing in our people and infrastructure, our ERP transition to SAP, as well as increased working capital and distribution capacity **to support strong consumer demand**.

30.     During the question and answer portion of the Q1 2024 Call, Defendant Amin was asked about the purported increase in demand for ELF's products:

**Q**: Hi. Good afternoon. Thanks very much for the question and congratulations on the results, very impressive. As we think about your shelf space gains and the increase in demand for your products, do you still feel comfortable with your current model of third-party manufacturing in China? This has been very successful in the past, but I'm wondering if you're looking to diversify the model or working to expand your manufacturing network. Thanks.

**A**: Hi, Anna. We feel great about our supply chain and the advantage we have as we talked in terms of the best combination of cost, quality and speed. ***And that supply chain has been highly resilient through the pandemic, coming out of the pandemic, meeting the very strong consumer demand we have***. But we also have been doing diversification efforts, really taking that same advantage we have, if like-minded suppliers with a high degree of control that we have over those suppliers. We started up additional operations in Thailand. We're looking at other geographies as well.

31.     On August 2, 2023, ELF filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ended June 30, 2023 (the "Q1 2024 10-Q"). The Q1 2024 10-Q made the following statement about the effectiveness of ELF's internal control over financial reporting:

As of June 30, 2023, **our management conducted an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures**, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2023, **our disclosure controls and procedures were effective** to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that such information is accumulated and communicated to the officers who certify our financial reports and to the members of the Company's senior management and board of directors as appropriate to allow timely decisions regarding required disclosure.

1    32.    Appended as an exhibit to the Q1 2024 10-Q were signed SOX certifications by the

2    Individual Defendants, attesting that "[t]he information in the [Q1 2024 10-Q] fairly presents, in all

3    material respects, the financial condition and results of operations of the Company."

4    33.    On November 1, 2023, ELF issued a press release announcing its financial results for

5    the second quarter ended September 30, 2023 (the "Q2 2024 Press Release").  In the Q2 2024 Press

6    Release, ELF stated that "Net sales increased 76% to $215.5 million, primarily driven by strength in

7    both retailer and e-commerce channels."  Defendant Amin was further quoted in the Q2 2024 Press

8    Release as stating: "In Q2, we grew net sales by 76% and category share by 330 basis points, marking

9    our 19th consecutive quarter of growth in each."

10    34.    That same day, ELF hosted an earnings call to discuss the Company's fiscal Q2 2024

11    results (the "Q2 2024 Call").  During the scripted portion of the Q2 2024 Earnings Call, Defendant

12    Amin stated, in relevant part:

13
    We again delivered on this winning formula in Q2 with both strong top line
14    growth and adjusted EBITDA margin expansion, supported by a combination
    of our **strong sales growth**, gross margin expansion and leverage in our non-
15    marketing SG&A expenses.

    As we've grown, we continue to make investments in our infrastructure. Our
16    supply chain offers the best combination of cost, quality and speed in our
    industry, and **has been able to keep pace with the strong consumer demand**
17    **we're seeing**.

18    35.    Also, during the scripted portion of the Q2 2024 Call, Defendant Fields stated, in

19    relevant part:

20
    Our balance sheet remains strong, and we believe positions us well to execute
    our long-term growth plans. **Our ending inventory balance was $147 million,**
21    **in line with our expectations and up from $81 million a year ago**. The
    difference is a combination of two things. As we said last quarter, we plan to
22    build back our inventory levels through fiscal 2024 **to support the strong**
    **consumer demand we're seeing**. In addition, approximately $37 million of
23    the increase is the result of taking ownership of inventory from China when
    it ships versus when it enters our distribution center here in the U.S.
24

25    36.    On November 2, 2023, ELF filed its Form 10-Q for the second quarter ended

26    September 30, 2023 ("Q2 2024 10-Q").  The Q2 2024 10-Q was signed by Defendants Amin and

27    Fields.  In the Q2 2024 10-Q, Defendants stated:

28

> We have assessed the impact on changes to our internal controls over financial reporting and conclude that **there have been no changes to our internal control over financial reporting** that occurred during the quarter ended September 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

37.    Appended as an exhibit to the Q2 2024 10-Q were signed SOX certifications by the Individual Defendants, attesting that "[t]he information in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

38.    On February 6, 2024, ELF issued a press release announcing its financial results for the third quarter ended December 31, 2023 (the "Q3 2024 Press Release").  In the Q3 2024 Press Release, ELF stated that "Net sales increased 85% to $270.9 million, primarily driven by strength in both retailer and e-commerce channels."  Defendant Amin was further quoted in the Q2 2024 Press Release as stating: "In Q3, we grew net sales by 85% and market share by 305 basis points, marking our 20th consecutive quarter of growth in each."

39.    That same day, ELF hosted an earnings call with investors and analysts to discuss the Company's fiscal Q3 2024 results (the "Q3 2024 Call").  During the scripted portion of the Q3 2024 Earnings Call, Defendant Amin stated, in relevant part:

> In Q3, we grew net sales by 85%, increased gross margin by nearly 350 basis points, and delivered $59 million in adjusted EBITDA, up 61% versus prior year. Our vision is to create a different kind of beauty company by building brands that disrupt norms, shape culture, and connect communities through positivity, inclusivity, and accessibility. **We've executed against this vision and delivered exceptional, consistent category leading growth**. Q3 marked our 20th consecutive quarter of net sales growth, putting e.l.f. Beauty in a rarefied group of consistent, high growth consumer companies. We're one of only five public consumer companies out of 274, that has grown for 20 straight quarters and averaged at least 20% sales growth per quarter.
>
> [...]
>
> In summary, as we enter our 20th year as a company, **we continue to deliver exceptional results**.

40.    During the scripted portion of the Q3 2024 Call, Defendant Fields stated, in relevant part:

> Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with approximately $72 million in cash on hand compared to a cash balance of $87 million a year ago. **Our ending inventory balance was $205 million in-line with our expect-**

*ations and up from $81 million a year ago*. The difference is primarily a combination of three things.

[F]irst, as we said last quarter, we continued to build back our inventory levels through fiscal 2024 *to support strong consumer demand*. Second, approximately $28 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the US; lastly, our consolidated results include Naturium for the first time, which added approximately $25 million of inventory. *We believe we have the appropriate levels of inventory across the business to service our customers and support the demand we're seeing.*

[...]

We expect our cash priorities for the year to remain on investing behind our growth initiatives and supporting strategic extensions. The initiatives we're focused on this year include continuing to invest in our people and infrastructure, our ERP transition to SAP, as well as increased working capital and distribution capacity *to support strong consumer demand*.

41.    On February 7, 2024, ELF filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended December 31, 2023 (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendants Amin and Fields. In the Q3 2024 10-Q, Defendants stated:

We have assessed the impact on changes to our internal controls over financial reporting and concluded that there have been *no changes to our internal control over financial reporting* that occurred during the quarter ended December 31, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

42.    Appended to the Q3 2024 10-Q as an exhibit was a signed SOX certification pursuant the Individual Defendants, attesting that "[t]he information in the [Q3 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

43.    On May 22, 2024, ELF issued a press release announcing its financial results for the three months and year ended March 31, 2024 (the "Q4 2024 Press Release"). In the Q4 2024 Press Release, ELF stated that "Net sales increased 71% to $321.1 million, primarily driven by strength across our retailer and e-commerce channels." Defendant Amin was further quoted in the Q2 2024 Press Release as stating: "In Q4, we grew net sales by 71% and expanded our market share by 325 basis points, marking our 21st consecutive quarter of net sales and market share growth."

44.    That same day, ELF hosted an earnings call with investors and analysts to discuss the Company's fiscal Q4 2024 results (the "Q4 2024 Call").  During the scripted portion of the Q4 2024 Call, Defendant Fields stated, in relevant part:

> Our balance sheet remains strong, and we believe positions us well to execute our long-term growth plans. We ended the quarter with $108 million in cash on hand compared to a cash balance of $121 million a year ago. Our ending inventory balance was $191 million, in line with our expectations and up from $81 million a year ago. The difference is primarily a combination of three things. First, as we've said the past few quarters, ***we continue to build back our inventory levels to support strong consumer demand***.
>
> Second, our consolidated results now include Naturium, which added approximately $26 million of inventory. Lastly, an additional $8 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the US.
>
> Our liquidity position remains strong. We ended the quarter with less than 1 times leverage in terms of net debt-to-adjusted EBITDA. We expect our cash priorities for fiscal 2025 to remain on investing behind our growth initiatives and supporting strategic extensions. The initiatives we're focused on this year include continuing to invest in our people and infrastructure, our ERP transition to SAP, as well as increased distribution capacity ***to support strong consumer demand***.

45.    On May 23, 2024, ELF filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal quarter and year ended March 31, 2024 (the "2024 10-K").  The 2024 10-K contained a substantively similar statement about the effectiveness of ELF's internal control over financial reporting as discussed *supra*.

46.    Appended to the 2024 10-K as an exhibit was a signed certification pursuant to SOX by the Individual Defendants, attesting that "[t]he information in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

47.    The statements referenced in ¶¶ 24-46 were materially false and misleading because Defendants: (1) failed to disclose that declining consumer demand trends were negatively impacting the Company's business; (2) falsely attributed the increase in ELF's inventory value to accounting adjustments arising from changes in shipping logistics and planned efforts to support "strong consumer demand"; (3) reported inflated ELF's revenues and profits; and (4) provided false assurances about the adequacy of ELF's inventory controls.

1

2

### B.    THE TRUTH BEGINS TO EMERGE
### WHILE ELF CONTINUES TO MISLEAD INVESTORS

3    48.    On August 8, 2024, investors began to learn the truth when the Company released its

4    fiscal Q1 2025 results and provided its outlook for fiscal Q2 2025.   Specifically, ELF issued

5    meaningfully weaker-than-anticipated guidance for fiscal Q2 2025 and acknowledged downward

6    pressure on its adjusted EBITDA guidance, approximately $30 million lower than expected by

7    analysts, signaling a sequential slowdown in top line growth.

8    49.    On this news, ELF's stock price fell $27.12 per share, or 14.4 percent, to close at

9    $160.83 per share on August 9, 2024.

10    50.    The market was surprised by this disappointing guidance.  For example, analysts at

11    UBS Research described the guidance as a "meaningful move" implying a more challenged channel

12    performance and called "the sequential slowdown in top line growth embedded in the outlook

13    perplexing as many of the key building blocks seem unchanged vs. 1Q."

14    51.    Despite these revelations, ELF continued to issue misleading statements regarding the

15    strength of consumer demand for its products, the cause of the ballooning inventory levels, and the

16    adequacy of its accounting controls.  In connection with the fiscal Q1 2025 results, ELF hosted an

17    earnings call with investors and analysts to discuss the Company's fiscal Q1 2025 results (the "Q1

18    2025 Call").  During the scripted portion of the Q1 2025 Call, Defendant Fields stated, in relevant

19    part:

20

21

22

23

24

25

26

> Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with $109 million in cash on hand, compared to a cash balance of $143 million a year ago. ***Our ending inventory balance was $200 million in line with our expectations and up from $98 million a year ago***. The difference is primarily a combination of three things. First, as we've said in the past few quarters, ***we continue to build back our inventory levels to support strong consumer demand***. Second, our consolidated results now include Naturium, which added approximately $26 million of inventory. Lastly, an additional $23 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the US.

[…]

27

28

> The specific initiatives we're focused on this year include continuing to invest in our people and infrastructure, our ERP transition to SAP, as well as increased distribution capacity to support **strong consumer demand**.

52.    On August 9, 2024, ELF filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended June 30, 2024 (the "Q1 2025 10-Q").  The Q1 2025 10-Q contained a substantively similar statement about the effectiveness of ELF's internal control over financial reporting as discussed *supra*.

53.    Appended to the Q1 2025 10-Q as an exhibit was a signed SOX certification by the Individual Defendants, attesting that "[t]he information in the [Q1 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

54.    On November 6, 2024, ELF issued a press release announcing its financial results for the three months ended September 30, 2024 (the "Q2 2025 Press Release").  In the Q2 2025 Press Release, ELF stated that "Net sales increased 40% to $301.1 million, primarily driven by strength in both our retailer and e-commerce channels, in the U.S. and internationally."  Defendant Amin was further quoted in the Q2 2025 Press Release as stating: "This was our 23rd consecutive quarter of both net sales growth and market share gains."

55.    That same day, ELF hosted an earnings call with investors and analysts to discuss the Company's fiscal Q2 2025 results (the "Q2 2025 Call").  During the scripted portion of the Q2 2025 Call, Defendant Fields stated, in relevant part:

> Moving to the balance sheet and cash flow, our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with $97 million in cash on hand compared to a cash balance of $108 million at the end of fiscal 2024. **Our ending inventory balance was $239 million in line with our expectations and up from $147 million a year ago**. Consistent with the last few quarters, the increase was driven by timing of when we take ownership of inventory from China, the addition of NATURIUM and **supporting the demand we're seeing**.
>
> Our liquidity position remains strong. We ended the quarter with less than 1 times leverage in terms of net debt to adjusted EBITDA. We expect our cash priorities for the year to remain on investing behind our growth initiatives and supporting strategic extensions. The specific growth initiatives we're focused on this year include investing in our people and infrastructure, our ERP transition to SAP, as well as increased distribution capacity **to support strong global consumer demand**.

[...]

Now, let's turn to our raised outlook for fiscal 2025. We are pleased to be in position to raise our outlook across both the top and bottom line. For the full year, *we now expect net sales growth of approximately 28% to 30%*, up from 25% to 27% previously. ***Our raised outlook reflects the outperformance in Q2 relative to our expectations***, pipeline related to the space gains we talked about with Target, Dollar General, and Walgreens as well as ongoing international momentum.

56.    During the Q2 2025 Call, Defendant Fields was asked about the excess inventory:

**Q**:  Nice job on the quarter. I guess, maybe I was wondering a little bit more on the innovation front. You talked about maybe having a little bit less this quarter. I guess, what franchises or categories do you think there's opportunities still to roll out new innovation? And then how long does it take, I guess, from incubation to shelf to get product out there? I guess, when should we expect more newness to come out? And then just really quick on the inventory, it looks like it did come down this quarter, so I'm curious if you're done kind of building up that excess inventory that you needed and how we should think about that – the inventory growth as we go forward? Thanks.

**A**: And then, Susan, on your question on inventory, *we feel great about our inventory position and feel that we have the inventory that we need to continue to support the demand that we're seeing*. In terms of buildup, we haven't given an outlook, but I do feel comfortable saying that as we go into kind of this – third quarter, typically there's a buildup as we're kind of looking at our spring innovation and there's pipeline and things like that that need to go out. And then you should see it come down a bit more as we get into Q4 and exit this year.

57.    Defendant Fields was again asked about the excess inventory during the Q2 2025 Call:

**Q**:  I wanted to ask about inventories again. I guess it still seems like it's a bit higher than maybe I would have expected, given your expectations for decelerating growth. And I look at it on a year-on-year basis, it was up more sequentially 1Q 2024 to 2Q 2024 and year-on-year then, but the growth was also much greater.  So, I guess, trying to figure out, is there something going on? Is it too much inventory? Like, what would be the timing of how long it's potentially good for?

[…]

**A**: Hi, Mark. Yeah. So, let me just maybe take you back a couple quarters on our inventory. So, last year around this time is when we started talking about the change with taking ownership earlier. So, we're taking ownership when products leave China instead of when it arrives here. So, *that had an impact on inventory. That has been for the last couple quarters that we've been talking about that. So, that's not a new thing or a new addition to our inventory narrative here*. And I want to address your question on obsolescence as well. There is no risk of obsolescence overall for our portfolio, color cosmetics, anything like that. And what you're seeing in the

14

build on inventory, as we've talked about, is really building for that global footprint.

So, we've talked about setting up distribution centers across the world, in Asia, in Germany, in the UK, here with the second DC here in the US, additional nodes on our e-commerce. *So, that also leads to higher inventory levels overall, but allows us to service the demand that we're seeing. So, we feel quite comfortable with the inventory that we have on hand and believe that it will be enough to help service that demand that we're seeing*.

58.     On November 7, 2024, ELF filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended September 30, 2024 (the "Q2 2025 10-Q").  The Q2 2025 10-Q contained a substantively similar statement about the effectiveness of ELF's internal control over financial reporting as discussed *supra*.

59.     Appended to the Q2 2025 10-Q as an exhibit were signed SOX certifications by the Individual Defendants, attesting that "[t]he information in the [Q2 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

60.     These statements concerning strong global consumer demand, ELF's elevated inventory levels, and the Company's internal controls were materially false and misleading to investors for the reasons discussed *supra*.

61.     Then, on November 20, 2024, Muddy Waters Research published a report accusing ELF of revenue fraud and raising concerns about the Company's inventory management practices. Specifically, the Muddy Waters Report alleged that ELF overstated its revenue by $135 million to $190 million during the Class Period.  The Muddy Waters Report further accused the Company of concealing declining customer demand from investors by falsely attributing the rising value of its inventory to a supposed change in its practice of taking ownership of inventory upon arrival at distribution centers in the United States instead of in China when the products ship.

62.     Following publication of the Muddy Waters Report, ELF's stock price fell $2.71 per share, or 2.23%, to close at $119.00 per share on November 20, 2024.

63.     In response to the Muddy Waters Report, ELF issued a statement in response, denying the allegation and stating that:

*We have rigorous inventory control procedures*, including regular physical and cycle counts across our global distribution network. Similarly, *we have*

*rigorous controls and procedures around revenue recognition*. We are fully confident in our financial statements.

64.    These statements concerning ELF's "rigorous inventory control procedures" and "rigorous control procedures around revenue recognition" were materially false and misleading to investors for the reasons discussed *supra*.

## THE TRUTH IS FULLY REVEALED

65.    On February 6, 2025, ELF released its fiscal Q3 2025 results and lowered its fiscal outlook for the first time since before the onset of the COVID-19 pandemic.  Specifically, ELF lowered its net sales outlook for the final quarter of the fiscal year to between minus 1 and plus 2 percent.  ELF further revealed that it expected full-year fiscal 2025 net sales growth to be in the range of 27 to 28 percent, down from the previous guidance of 28 to 30 percent.  The Company also revised its adjusted EBITDA guidance downward to $289 to 293 million, from $304 to 308 million.  Management explained that this downward revision in guidance reflected lower demand trends, challenging category conditions, and slower-than-expected new product performance.

66.    On this news, ELF's stock price fell $17.36 per share, or 19.6 percent, to close at $71.13 per share on February 7, 2025.

67.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

68.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired ELF securities between May 25, 2023 and February 6, 2025, inclusive (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of ELF, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

69.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the

parties and the Court.  Throughout the Class Period, ELF's common stock was actively traded on the New York Stock Exchange, one of the largest stock exchanges in the world.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  During the Class Period, there were more than 56 million shares of ELF common stock outstanding, and the average daily trading volume was over 1.7 million shares.  Record owners and other members of the Class may be identified from records maintained by ELF or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

70.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)  Whether Defendants violated the Exchange Act;

(b)  Whether Defendants omitted and/or misrepresented material facts;

(c)  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)  Whether the price of ELF securities were artificially inflated; and

(f)  The extent of damage sustained by members of the Class and the appropriate measure of damages.

71.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

72.    Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation.  Plaintiff has no interests which conflict with those of the Class.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

74.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiff and other members of the Class purchased ELF securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

75.    At all relevant times, the market for ELF securities was efficient for the following reasons, among others:

76.    As a result of the foregoing, the market for ELF securities promptly digested current information regarding ELF from all publicly available sources and reflected such information in the price of ELF securities.

(a) as a regulated issuer, ELF filed periodic public reports with the SEC;

(b) ELF regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)  ELF was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain

1      customers of their respective brokerage firms and that were publicly available and

2      entered the public marketplace; and

3      (d) ELF securities were actively traded in an efficient market, including its common

4      stock that was traded on the NYSE, under the ticker symbol "ELF."

5      **NO SAFE HARBOR**

6      77.    The statutory safe harbor provided for forward-looking statements under certain

7 circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The

8 statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

9 In addition, to the extent certain of the statements alleged to be false may be characterized as forward-

10 looking, they were not identified as "forward-looking statements" when made and there were no

11 meaningful cautionary statements identifying important factors that could cause actual results to differ

12 materially from those in the purportedly forward-looking statements. In the alternative, to the extent

13 that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein,

14 Defendants are liable for those false forward-looking statements because at the time each of those

15 forward-looking statements were made, the speaker had actual knowledge that the forward-looking

16 statement was materially false or misleading, and/or the forward-looking statement was authorized or

17 approved by an executive officer of ELF who knew that the statement was false when made.

18      **LOSS CAUSATION**

19      78.    During the Class Period, as detailed herein, ELF and the Individual Defendants made

20 materially false and misleading statements and omissions, and engaged in a scheme to deceive the

21 market. These false and misleading statements and omissions artificially inflated the price of ELF

22 securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior

23 misrepresentations and fraudulent conduct were disclosed to the market, the price of ELF securities

24 fell significantly. As a result of their purchases of ELF securities during the Class Period, Plaintiff

25 and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

26

27

28

1

2

3

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

4          79.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

5    forth herein.

6          80.    This Count is asserted against Defendants based upon Section 10(b) of the Exchange

7    Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

8          81.    During the Class Period, Defendants, individually and in concert, directly or indirectly,

9    disseminated or approved the false statements specified above, which they knew or deliberately

10   disregarded were misleading in that they contained misrepresentations and failed to disclose material

11   facts necessary in order to make the statements made, in light of the circumstances under which they

12   were made, not misleading.

13         82.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

14              (a) employed devices, schemes and artifices to defraud;

15              (b) made untrue statements of material facts or omitted to state material facts

16                  necessary in order to make the statements made, in light of the circumstances under

17                  which they were made, not misleading; or

18              (c) engaged in acts, practices and a course of business that operated as a fraud or deceit

19                  upon plaintiff and others similarly situated in connection with their purchases of

20                  the Company's securities during the Class Period.

21         83.    Defendants acted with scienter in that they knew that the public documents and

22   statements issued or disseminated in the name of the Company were materially false and misleading;

23   knew that such statements or documents would be issued or disseminated to the investing public; and

24   knowingly and substantially participated or acquiesced in the issuance or dissemination of such

25   statements or documents as primary violations of the securities laws.  These defendants, by virtue of

26   their receipt of information reflecting the true facts of the Company, their control over, and/or receipt

27   and/or modification of the Company's allegedly materially misleading statements, and/or their

28

associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

84.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ELF personnel to members of the investing public, including Plaintiff and the Class.

85.    As a result of the foregoing, the market price of ELF securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ELF securities during the Class Period in purchasing ELF securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

86.    Had Plaintiff and the other members of the Class been aware that the market price of ELF securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

87.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

88.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ELF securities during the Class Period.

### COUNT II

### Violations of Section 20(a) of The Exchange Act
### Against the Individual Defendants

89.    Plaintiff repeats, and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

91.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

92.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

93.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

1.  Declaring this action to be a proper class action, designating Plaintiff as Lead plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

2.  Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

**3.**    Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

3

4

**4.**    Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

5

6

7

### C.    JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

8

DATED: April 8, 2025

9

Respectfully submitted,

10

/s/ Lucas E. Gilmore

**HAGENS BERMAN SOBOL SHAPIRO LLP**

11

Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300

12

Berkeley, California 94710
Telephone: (510) 725-3000

13

Facsimile: (510) 725-3001
lucasg@hbsslaw.com

14

15

*Liaison Counsel for Plaintiff*

16

17

**LABATON KELLER SUCHAROW LLP**

Francis P. McConville (*pro hac vice forthcoming*)

18

Connor C. Boehme (*pro hac vice forthcoming*)
140 Broadway

19

New York, New York 10005
Telephone: (212) 907-0700

20

Facsimile: (212) 818-047
fmcconville@labaton.com

21

cboehme@labaton.com

22

*Counsel for Plaintiff*

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION

I, Timothy J. Smyth, as Executive Officer of Boston Retirement System ("Boston"), hereby certify as follows:

1.       I am fully authorized to enter into and execute this Certification on behalf of Boston. I have reviewed a complaint prepared against e.l.f. Beauty, Inc. ("ELF") alleging violations of the federal securities laws, generally adopt the allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint, and authorize the filing of this pleading;

2.       Boston did not purchase securities of ELF at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.       Boston is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Boston fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.       Boston's transactions in ELF securities during the Class Period are reflected in Exhibit A, attached hereto;

5.       Boston sought to serve or currently serves as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

*City of Fort Lauderdale Police and Firefighters Retirement System v Pegasystems Inc.*,
No. 1:22-cv-11220 (D. Mass.)
*Shapiro v. TG Therapeutics, Inc.*, No. 1:22-6106 (S.D.N.Y.)
*In re Barclays PLC Securities Litigation*, No. 1:22-cv-8172 (S.D.N.Y.)
*In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-1936 (S.D. Cal.)
*Vazquez v. Masimo Corporation*, No. 3:23-cv-1546 (S.D. Cal.)
*Lemm, Jr. v. New York Community Bancorp, Inc.*, No. 1:24-cv-0903 (E.D.N.Y.)
*Baxter v. PDD Holdings Inc. f/k/a Pinduoduo Inc.*, No. 1:24-cv-5653 (E.D.N.Y.)
*Long v. Stellantis N.V.*, No. 1:24-cv-6196 (S.D.N.Y.)
*Shannahan v. FTAI Aviation Ltd.*, No. 1:25-cv-0541 (S.D.N.Y.)

6.    Beyond its *pro rata* share of any recovery, Boston will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this the 7th day of April, 2025.

Timothy J. Smyth, Esquire
Executive Officer
Boston Retirement System

EXHIBIT A

<u>TRANSACTIONS IN E.L.F. BEAUTY, INC. COMMON STOCK</u>

| Transaction Type | Trade Date | Shares | Share Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchases | 08/02/2023 | 2,000 | $134.5601 | ($269,120.20) |
| Purchases | 08/04/2023 | 2,100 | $128.9003 | ($270,690.63) |
| Purchases | 08/17/2023 | 2,900 | $119.6226 | ($346,905.54) |
| Purchases | 08/23/2023 | 200 | $121.0100 | ($24,202.00) |
| Purchases | 08/24/2023 | 400 | $121.5595 | ($48,623.80) |
| Purchases | 08/25/2023 | 200 | $119.9444 | ($23,988.88) |
| Purchases | 09/25/2023 | 420 | $106.3939 | ($44,685.44) |
| Purchases | 10/03/2023 | 1,400 | $98.8761 | ($138,426.54) |
| Purchases | 10/31/2023 | 600 | $90.3762 | ($54,225.72) |
| Purchases | 11/02/2023 | 5,700 | $95.5329 | ($544,537.53) |
| Purchases | 11/10/2023 | 1,400 | $93.5283 | ($130,939.62) |
| Purchases | 12/22/2023 | 680 | $142.6533 | ($97,004.24) |
| Purchases | 04/03/2024 | 900 | $166.7745 | ($150,097.05) |
| Purchases | 07/29/2024 | 600 | $174.4980 | ($104,698.80) |
| Purchases | 07/30/2024 | 1,490 | $167.7173 | ($249,898.78) |
| Purchases | 07/30/2024 | 2,770 | $170.2217 | ($471,514.11) |
| Purchases | 08/09/2024 | 2,600 | $164.1923 | ($426,899.98) |
| Purchases | 08/12/2024 | 900 | $146.1878 | ($131,569.02) |
| Purchases | 08/16/2024 | 2,100 | $156.7568 | ($329,189.28) |
| Purchases | 09/03/2024 | 2,300 | $141.1633 | ($324,675.59) |
| Purchases | 09/13/2024 | 1,200 | $119.6871 | ($143,624.52) |
| Purchases | 09/17/2024 | 1,000 | $113.3991 | ($113,399.10) |
| Purchases | 09/19/2024 | 1,000 | $115.9171 | ($115,917.10) |
| Purchases | 09/26/2024 | 750 | $111.5810 | ($83,685.75) |
| Purchases | 09/27/2024 | 12,249 | $112.5958 | ($1,379,185.95) |
| Purchases | 10/03/2024 | 1,274 | $105.2103 | ($134,037.92) |
| Purchases | 10/11/2024 | 60 | $107.3000 | ($6,438.00) |
| Purchases | 10/11/2024 | 2,800 | $109.7223 | ($307,222.44) |
| Purchases | 10/16/2024 | 2,745 | $107.3608 | ($294,705.40) |
| Purchases | 01/13/2025 | 2,230 | $129.5628 | ($288,925.04) |
| Purchases | 01/13/2025 | 640 | $130.8865 | ($83,767.36) |
| Purchases | 01/13/2025 | 170 | $124.8350 | ($21,221.95) |
| Purchases | 01/14/2025 | 380 | $133.5750 | ($50,758.50) |
| Purchases | 01/14/2025 | 1,400 | $133.1055 | ($186,347.70) |
| Sales | 01/17/2025 | (205) | $130.9466 | $26,844.05 |
| Sales | 02/03/2025 | (660) | $94.2850 | $62,228.10 |
| Sales | 02/03/2025 | (1,390) | $94.3955 | $131,209.75 |

| Transaction Type | Trade Date | Shares | Share Price | Cost/ Proceeds |
|---|---|---|---|---|
| Sales | 02/03/2025 | (170) | $94.1050 | $15,997.85 |
| Sales | 02/03/2025 | (3,640) | $94.2979 | $343,244.36 |
| Sales | 02/03/2025 | (620) | $94.2739 | $58,449.82 |
| Sales | 02/04/2025 | (2,480) | $89.0937 | $220,952.38 |
| Sales | 02/04/2025 | (1,900) | $87.8066 | $166,832.54 |
| Sales | 02/04/2025 | (1,080) | $89.1683 | $96,301.76 |
| Purchases | 02/06/2025 | 2,692 | $87.5989 | ($235,816.24) |